262 P.2d 243

FRITSCHE et ux. v. HUDSPETH et al.

No. 5644.

Supreme Court of Arizona.

Oct. 27, 1953.

Joseph H. Morgan, Phoenix, for appellants.

Favour & Quail, Prescott, for appellees T. J. Hudspeth and Minnie B. Hudspeth, his wife.

Byrne & Byrne, Prescott, for appellee Ash Fork Live Stock Co., a corporation.

WINDES, Justice.

Action by H. W. Fritsche and wife against T. J. Hudspeth, his wife Minnie B. Hudspeth, and Ash Fork Live Stock Company, a corporation, seeking damages and to enjoin the defendants from obstructing the flow of certain flood waters as they drained into and passed down Partridge Creek, a tributary of Chino Wash, upon which is located plaintiffs' property and point of claimed diversion. Trial was had before the court sitting without a jury which made findings to the effect that the defendant Ash Fork Live Stock Company maintains for livestock watering purposes a livestock watering tank known as the Hog Ranch Dam; that the defendants Hudspeth maintain three livestock watering tanks known as Hazen Dam, Beacon Dam and Garden Dam, together with diversion works for draining flood waters from Ash Creek to Beacon Dam. The court further found that plaintiffs had no prior rights to the waters involved, that the diversion works of the defendants did not deprive plaintiffs of any water to which they were entitled nor obstruct waters which could be beneficially applied by the plaintiffs and that plaintiffs had suffered no damage. Based upon these findings, judgment was rendered for the defendants. Plaintiffs appeal, claiming in effect that there is not sufficient evidence to legally warrant the findings and judgment. The parties will be referred to here as designated in the trial court.

A reading of the testimony and an examination of the exhibits seem to establish that plaintiffs prior to 1919 did divert and put to beneficial use certain flood waters of Chino Wash, and that defendants and their predecessors in interest had long prior to 1919 at various locations on the creeks and washes draining into Chino Wash put the waters thereof to beneficial use for stock watering purposes. Unques-

tionably the defendants have maintained the dams and water tanks created thereby as designated in the court's findings, and the same were constructed about the year 1946, long after plaintiffs had been putting to beneficial use flood waters that reached their place on Chino Wash. These works are constructed on Partridge Creek and the tributaries thereto, approximately twenty to thirty miles above plaintiffs' point of diversion. Partridge Creek is a main tributary to Chino Wash. It cannot well be disputed, and in fact is conceded, that all the contesting parties have some rights to the use of the waters in the drainage area, plaintiffs for irrigation and the defendants for stock watering. Whether plaintiffs are entitled to the relief sought depends upon whether the undisputed evidence compels the conclusion that the defendants have no right to capture and impound the flood waters in question for stock water or whether by so doing they prevented waters to which plaintiffs are entitled from reaching their point of diversion and thereby deprived them of the use thereof.

■ There was evidence tending to show that water was impounded for stock watering in the drainage area many years ago; that the Santa Fe Railroad Company had dams which the predecessors in interest of the defendants used, but by reason of government exchange of land they lost these facilities; stock water was captured and impounded as early as 1906 at the Irish Dam, the Santa Fe Dam and what is desig-nated as the Bixley Diversion Works. There is also evidence that the Beacon Tank was originally built in 1909; that in and near the location of the Garden Tank there was formerly a natural tank that would hold water for approximately six months and prior to that, about fifty years ago, there was another tank, with a holding capacity about the same as the present Garden Dam, that washed out. In the early years more stock were watered from these various sources than at the present time. All in all the evidence warrants the conclusion that shortly after the beginning of the century stock water was captured and stored for watering a greater number of livestock than are now using the present storage facilities. In the light of the testimony the court was legally justified in taking the position that the defendants had established a right to capture and impound water to serve their stock, at least in an amount sufficient to supply the number now making use thereof. The most that can be said is that there have been changes in the location of storage facilities, with possibly some enlargement of the capacity thereof as an insurance against the hazards of dry seasons. The court certainly would be justified in the conclusion that there was no enlarged usage. The general rule is that given a right to the capture and use of water in an amount, one has the right to change the place of storage or diversion so long as other users' rights are not impaired. Lindsey v. McClure, 10 Cir., 136 F.2d 65.

Plaintiffs contend that their rights have been impaired because the changes have resulted in the capturing and storing of water in excess of the needs of the defendants, that there has been waste and loss by evaporation and leakage, and that because thereof these waters have never reached the plaintiffs' point of diversion. There is no evidence concerning evaporation that would enable a court to measure its influence on plaintiffs' supply. It does appear that in the past there had been considerable loss from waste through leakage. The evidence is, however, that this difficulty has been remedied and the evil eliminated. Witness Scott, as an expert, testified that in his opinion filling the holes where the leaks occurred would tend to conserve water.

■■■ The drainage channels designated as Partridge, Ash and Johnson Creeks, the flood-water flow of which has been intercepted by the creation of defendants' storage tanks, are not creeks of permanent surface waters but, except during flood stage, are dry washes. Witness Scott, a consulting engineer and expert on the subject, rendered extensive testimony concerning the subject matter, and while his final conclusions concerning the effect on the flow of the flood waters to the plaintiffs is not too clear, we think it is susceptible of the interpretation that it would take a major flood to saturate a dry stream bed and reach the plaintiffs in sufficient quantity to be of use without the existence of the obstructions, and with the existence thereof there would

be at most a delay in but not a deprivation of the arrival of the flood waters to the plaintiffs' ranch. We are of the view that from all of the testimony the trial court was fortified by sufficient evidence to say that the plaintiffs did not prove that the defendants or either thereof stored water in excess of their needs or wasted water which would otherwise have reached plaintiffs' point of diversion in a beneficial amount. In other words the evidence does not compel the conclusion that the changes in the storage facilities constructed by the defendants resulted in an injury to the plaintiffs. Under such circumstances, it is not the function of this court to weigh the evidence, and we cannot say that the testimony submitted in this case has the force of compelling the conclusion that plaintiffs are entitled to recover.

The judgment is affirmed.

STANFORD, C. J., and LA PRADE and UDALL, JJ., concur.

FARLEY, Superior Court Judge, dissents.

PHELPS, J., being unable to take part in the case, the Honorable Gordon FARLEY, Judge of the Superior Court of Santa Cruz County, participated in his stead in the determination of this appeal.

FARLEY, Superior Court Judge (dissenting).

The issue is principally one of fact to determine whether the evidence supports the trial court's findings. The rule has been repeatedly stated in this jurisdiction that

where testimony is conflicting the findings and judgment, in the absence of a mistake of law, will be upheld; but if the testimony supporting the appellants' claim is uncontradicted, or there is no substantial or reasonable evidence to support the findings and judgment, they will be set aside. State Tax Commission v. Magma Copper Co., 41 Ariz. 97, 15 P.2d 961; LaRue v. Kosich, 66 Ariz. 299, 187 P.2d 642; In re Gary's Estate, 69 Ariz. 228, 211 P.2d 815; Blaine v. Blaine, 63 Ariz. 100, 159 P.2d 786. This case comes within the latter exception as I view the evidence.

It is plaintiffs' position that defendants' interference substantially lessens the flow of flood waters at their ranch, and that their rights are prior and superior to any possessed by the defendants, except for the limited uses the defendants had for stock watering in 1919, and that plaintiffs' testimony respecting the validity of their appropriation was wholly uncontradicted and consequently they were entitled to have a finding declaring the validity of their appropriation. Likewise, they urge the proof was uncontested that defendants' diversion and dams enlarged their uses far beyond that being made for stock watering purposes when plaintiffs' appropriation had become established and beyond their present needs, and as to such additional uses their rights were junior to plaintiffs'.

The defendants, however, take the position that they and their predecessors in interest were using water for stock purposes at the time the plaintiffs' rights were initiated, and that plaintiffs have failed to establish the right to the waters of Chino Wash upon which they base their complaint.

The majority view concedes that "all the contesting parties have some rights to the use of the waters in the drainage area, plaintiffs for irrigation and the defendants for stock watering", but the extent of such rights are not defined.

A review of the transcript of evidence reveals that prior to 1946 defendants and their predecessors in interest diverted no appreciable amount of water from Ash Creek, and maintained only small dams or watering places 7 to 10 feet in height on Partridge and Johnson Creeks which were capable of holding approximately 50 acre-feet of water, and which were in no way comparable to the present structures. Such were the limits of defendants' rights in 1919 when plaintiffs' rights became vested. The testimony was uncontradicted that the new structures were greatly enlarged over the previous dams used by defendants and were constructed in such a manner that a great deal of water was lost by seepage into the porous side walls.

It is to be noted that the majority opinion recognizes plaintiffs' contention that their rights have been impaired because the changes made by defendants have resulted in the capturing and storage of water in excess of the needs of the defendants, but like the defendants it fails to answer that contention. Inasmuch as defendants' rights

for stock watering purposes are necessarily grounded upon its needs, it follows that some definite limitations should be placed upon the size of its obstructions and quantity of water impounded.

It is ineluctable that the net result of defendants' dams and diversion have been to obstruct, divert or dissipate a great quantity of water, beyond defendants' normal requirements, which would normally reach plaintiffs. To sum up, it may be said that since 1913 until 1946 plaintiffs had an adequate supply of water for their farming enterprise, which they can no longer enjoy since the construction of defendants' dams and diversion. That simple, inescapable fact leads to the conclusion that the judgment of the lower court was erroneous and should be reversed.